UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                 :
BRIAN SADUSKY                  :              3:19 CV 736 (RMS)
                                   :
V.                                :
                                   :
ANDREW SAUL,              :
COMMISSIONER           :
OF SOCIAL SECURITY[1]       :             DATE: MAY  26, 2020
                                   :
------------------------------------------------------ x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

disability insurance benefits ["SSDI"].

I.       ADMINISTRATIVE PROCEEDINGS

On March 27, 2017, the plaintiff filed an application for SSDI, claiming that he had been

disabled since May 8, 2016, due to a cervical spine injury. (*See* Certified Transcript of

Administrative Proceedings, dated July 3, 2019 ["Tr."] 172-78; *see* Tr. 68, 194). The plaintiff's

application was denied initially and upon reconsideration. (Tr. 89-99, 102-09).  On May 11, 2018,

a hearing was held before Administrative Law Judge ["ALJ"] Michael McKenna, at which the

plaintiff and a vocational expert testified.  (Tr. 39-66; *see* Tr.  113-29, 132-56, 226-28). On June

25, 2018, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr.

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security.  (Doc. No. 1).  Andrew M. Saul is now the Commissioner of Social Security. He is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. P. 25(d).  The Clerk of the Court shall amend the caption in this case as indicated above.

12-24). On June 25, 2018, the plaintiff requested review of the ALJ's decision (Tr. 157-60), and on April 5, 2019, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On May 14, 2019, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on May 17, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 8). This case was transferred accordingly. On October 14, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 14), with a brief (Doc. No. 14-2 ["Pl.'s Mem."]), and Statement of Material Facts (Doc. No. 14-1) in support. (*See* Doc. No. 13, 15). On January 13, 2020, the defendant filed his Motion to Affirm with brief (Doc. No. 18-1 ["Def.'s Mem."]) and a Statement of Material Facts (Doc. No. 18-2) in support. (*See* Doc. Nos. 16-17).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is GRANTED, and the defendant's Motion to Affirm (Doc. No. 18) is DENIED.

II.     FACTUAL BACKGROUND

At the time of his hearing in May 2018, the plaintiff was 54 years old and was living alone in a house. (Tr. 43; *see* Tr. 67). The plaintiff has a high school diploma, and, as of that time, he drove, shopped for groceries, ran errands, dusted, and, about once every other month, he would vacuum. (Tr. 45, 52, 57).  He went out "once in a while with friends for coffee or a lunch."  (Tr. 57).

The plaintiff only held one job, a table games dealer at a casino, for twenty-three years before he became unable to work as a result of a work-related neck injury.  (Tr. 195, 276; *see* Tr. 332).  He testified that this job required him to be on his feet all day, dealing cards, reaching,

stretching, paying, and taking money. (Tr. 45-46). He testified that his pain in his neck, arms and hands had gotten progressively worse despite treatments he received for his neck. (Tr. 47-48). He explained that his hands would shake and cause him difficulty in picking up coins, tying, zipping zippers, and buttoning buttons. (Tr. 48). Additionally, he would drop things because he could not feel them, and he could not "really feel hot or cold." (Tr. 49). According to the plaintiff, he could only stand still for twenty minutes, could walk for ten or fifteen minutes, and could sit in a straight back chair for twenty minutes before experiencing pain. (Tr. 51-52). The plaintiff had a twenty-minute break every hour when he was working as a dealer, but, even with the break, he could not do his job. (Tr. 54).

He did traction at home each day, which relieved his pain for a short period of time. (Tr. 53, 55). At the time of the hearing, the plaintiff had just settled his workers' compensation case for $50,000. (Tr. 55). Additionally, he was collecting long-term disability insurance. (Tr. 59).

The vocational expert classified the plaintiff's past work as a gambling dealer as light work. (Tr. 60). When presented with a hypothetical of an individual capable of light work, who could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand, walk and sit for six hours in an eight hour day; frequently push and pull; occasionally reach overhead; frequently perform fine and gross manipulations with the bilateral upper extremities; frequently climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally crawl; and, avoid extreme cold, vibrations and hazards, the vocational expert testified that such an individual could not perform the plaintiff's past work because a gambling dealer involves reaching overhead. (Tr. 61). Such an individual, however, could perform the work of a parking lot attendant or sales attendant. (Tr. 61-62).

The vocational expert further opined that, if such an individual could only occasionally perform fine and gross manipulations, that individual could not perform the plaintiff's past work, nor could that individual perform the work of a parking lot or sales attendant, because those positions all involve frequent fingering.  (Tr. 62).  Such an individual, however, could perform the work of a school bus monitor, counter attendant, or usher.  (Tr. 62).   If this person was required to take additional breaks of forty-five minutes each in the morning and in the afternoon, he could not be employed. (Tr. 63). Similarly, the vocational expert explained that, if such an individual was absent from work twice a month, or that individual was off task fifteen percent of the time, he could not be employed.  (Tr. 63-64).

The vocational expert testified that, if an individual with the same limitations discussed above, was limited to lifting and carrying "[ten] pounds occasionally[,]" that individual would be able to perform the work of a booth cashier.  (Tr. 64-65).

## III.   THE ALJ'S DECISION

Following the five-step evaluation process,[2] the ALJ found that the plaintiff met the insured status requirements through March 31, 2022 (Tr. 17), and that the plaintiff had not engaged in substantial gainful activity since May 8, 2016, the alleged onset date. (Tr. 17, citing 20 C.F.R. §

---

[2] First, the ALJ must determine whether the claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is currently employed, the claim is denied.  *Id.*  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998).  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

4

404.1571 *et seq.*).   At step two, the ALJ found that the plaintiff had the following severe impairment: degenerative disc disease of the cervical spine. (Tr. 17, citing 20 C.F.R. § 404.1520(c)).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

He determined that the plaintiff had the residual functional capacity ["RFC"] to perform light work as defined in 20 C.F.R. § 404.1567(b), except with the further limitations that

> he [could] occasionally lift/carry [twenty] pounds; frequently lift/carry [ten]
> pounds; stand/walk for [six] hours in an [eight] hour day; sit for [six] hours in an
> [eight] hour day; frequently push/pull, occasionally reach overhead and frequently
> perform fine and gross manipulation with the bilateral upper extremities; frequently
> climb ramps/stairs; never climb ladders/ropes/scaffolds; frequently balance, stoop,
> kneel and crouch; occasionally crawl[, and] [h]e must avoid extreme cold,
> vibrations and hazards, such as heights and moving machinery.

(Tr. 18).

At step four, the ALJ found that the plaintiff was capable of performing his past relevant work as a gambling dealer as this work did not require the performance of work-related activities precluded by the claimant's RFC. (Tr. 22-23, citing 20 C.F.R. § 404.1565).  Accordingly, the ALJ concluded that the plaintiff had not been under a disability at any time from May 8, 2016, through the date of his decision. (Tr. 24, citing 20 C.F.R. § 404.1520(f)).

IV.   STANDARD OF REVIEW

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d. Cir. 2012) (citation & internal

quotation marks omitted); *see* 42 U.S.C. § 405(g). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation & internal quotation marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation & internal quotation marks omitted). Upon review, it is not the court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff argues that: (1) the ALJ failed to develop the record (Pl.'s Mem. at 1-7); (2) the ALJ failed to follow the treating physician rule as he did not acknowledge three medical source statements from Dr. Daniel George and assigned controlling weight to the opinion of Dr. Stephen Saris, who examined the plaintiff only once (*id.* at 7-11); (3) the ALJ erred in his evaluation of the plaintiff's chronic pain (*id.* at 12-14); (4) the ALJ's step three analysis of Listing 1.04 was "insufficient" (*id.* at 14-15); and, (5) the ALJ's analysis at steps four and five was deficient. (*Id.* at 16-24).

In response, the defendant argues that an ALJ's failure to evaluate all of the medical opinions of the record does not necessarily warrant remand (Def.'s Mem. at 10); the ALJ relied on

the opinions of Dr. Saris, and the State agency medical consultants, which provided substantial evidence to support his RFC (*id.* at 4-10); the ALJ did not err in failing to develop the record as he relied on the providers' assessments of the missing reports (*id.* at 11-13); the ALJ adequately considered the consistency of the plaintiff's subjective complaints with the evidence of the record (*id.* at 14-15); the ALJ's step three finding was adequately based on the State agency medical consultants' opinions (*id.* at 16-17); and, substantial evidence supports the step four and step five findings. (*Id.* at 17-18).

A.    THE ALJ ERRED IN HIS CONSIDERATON OF THE MEDICAL OPINIONS OF THE RECORD AND FAILED TO FILL GAPS IN THE RECORD

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess,* 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]).   Only "acceptable medical sources" can provide medical opinions and are considered treating sources whose opinions are entitled to controlling weight. *See* 20 C.F.R. §§ 416.927(a)(2), (c).

When the ALJ "do[es] not give the treating source's opinion controlling weight," as happened here, he must "explicitly consider" the factors listed in 20 C.F.R. § 404.1527(c)(2), including: "'(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam)). Unless after "'a searching review of the record'" the reviewing court is "assure[d] . . . that the 'substance of the treating physician rule was not traversed,'" the ALJ's failure to apply these factors requires

7

remand. *Estrella*, 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). After reviewing the medical record, and the ALJ's decision, this Court concludes that the ALJ failed to properly apply these factors.

The plaintiff's cervical impairment predated his onset date of disability by nearly two years. The first medical record in the transcript is an electromyogram ["EMG"] from January 11, 2016 which revealed: (1) moderately severe bilateral C8 and bilateral C7 polyradiculopathies with evidence of chronic denervation and reinnervation changes along with ongoing denervation; (2) milder bilateral C6 radiculopathies with chronic denervation and reinnervation changes; and, (3) mild right ulnar neuropathy at the elbow with evidence of conduction block and sparing of sensory fibers. (Tr. 29-30).

The plaintiff was seen by Dr. Biren Chokshi of Orthopedic Associates of Windham County two days later for complaints of bilateral hand pain. (Tr. 320-21). Dr. Chokshi opined that: "The patient has multilevel cervical radiculopathy. There is a possibility of other neuropathy. It is unlikely that his symptoms are caused by carpal tunnel syndrome. The patient certainly has bilateral upper extremity symptoms from repetitive overuse as a dealer at Foxwoods." (Tr. 321).

An MRI was done on January 27, 2016, the results of which revealed:

1. Broad-based central disc protrusion and Broad-based central disc protrusion and retrosubluxation of C4-C5 with moderate loss of disc height. Moderate left foraminal narrowing.

2. Endplate edema and loss of disc height at C5-C6 with a disc-osteophyte complex and mild central canal stenosis with severe foraminal narrowing.

3. Retrosubluxation and disc-osteophyte complex with moderate-to-severe loss of disc height at C6-C7. Severe foraminal narrowing and mild central canal stenosis.

4. Severe bilateral foraminal narrowing at C7-T1 with bulging disc and uncovertebral joint spurring, worse on the right side.

8

5. Areas of T2 hyperintense signal abnormality in the dorsal paramedian aspects of the cord primarily at the C5-C6 and C6-C7 levels. Findings are suspected to be due to myelomalacia from spondylosis. Subacute combined degeneration from B12 deficiency could have a similar appearance but is usually more extensive. Recommend clinical correlation.

(Tr. 31-33). The plaintiff returned to Dr. Chokshi on February 22, 2016, who restricted him to dealing Baccarat only and referred him for spine surgery. (Tr. 323).

The plaintiff began treating with Dr. Daniel George, an orthopedic surgeon with Orthopedic Associates of Windham County, on March 10, 2016. (Tr. 324-26). Dr. George recommended a "quite involved" three- or four-level surgical procedure. (Tr. 325). The plaintiff indicated a preference for non-surgical intervention, so an epidural steroid injection was administered by Dr. Brian King on April 20, 2016. (Tr. 34).

The plaintiff returned to Dr. George on April 27, 2016, about one week prior to his onset date of disability. (Tr. 327-29). On examination, "he [had] some decreased sensation in the C7 and C8 distributions of both hands and arms, worse on the right side. He [had] weakness, especially in finger abduction to a mild degree and grip strength and possible elbow extension[.]" (Tr. 328). He reviewed the previous MRI "in detail[,]" noting that there was "severe foraminal narrowing at C6-7 and C7-T1 bilaterally. Some spinal cord changes noted around the C5-6 level and fairly severe disc space narrowing and degenerative changes in both MRI and plain x-ray between C4 and T1." (*Id.*). He assessed the plaintiff with "[b]ilateral C7 and C8 radiculopathies; multilevel cervical spondylosis; [s]evere bilateral foraminal narrowing, especially C6-7 and C7-T1, but also present at C5-6; [c]ervical spinal cord changes at the C5-6 level; [c]ervical spondylosis C4-5 with less foraminal narrowing; [and] neck injury." (*Id.*). Dr. George stated that "because of the numbness and weakness in his hands he was a candidate for surgical treatment sooner rather than later." (*Id.*). He added that the "patient would really like to try one more epidural steroid injection before

considering surgery, and frankly, I don't think this is going to help much." (*Id.*). Thus, just days before the plaintiff's May 6, 2016 onset date of disability, his treating orthopedic surgeon concluded that the plaintiff was a candidate for surgical intervention.

Following the plaintiff's onset date of disability, he had a second epidural steroid injection (at the C5-6 level) on June 1, 2016. (Tr. 38). The plaintiff returned to Dr. George nine days later, on June 10, 2016 (Tr. 283, 330-31). Dr. George stated: the plaintiff "had an EMG of the right upper extremity since I saw him last. He also had an independent medical examination ["IME"], I believe yesterday. We do not have the note from this yet. This was with a neurosurgeon in Hartford according to the patient." (Tr. 283, 330). Dr. George noted that the plaintiff was able to work modified duty, dealing Baccarat only. (Tr. 331). He explained to the plaintiff that "given the multilevel nature of his cervical spine pathology and the diffuse findings . . . [it was] difficult to pinpoint the exact levels that would be best to help him. Certainly[,] an EMG would've been helpful in localizing exactly the levels of nerve compression, but it seems to have come back as normal." (*Id.*). Neither the EMG, nor this 2016 IME, is in the record.

The plaintiff returned to Dr. George on June 24, 2016 (Tr. 284-85, 332-33), accompanied by a "nurse case manager." (Tr. 284, 332). Dr. George noted that the IME "is recommending against any surgical intervention" which Dr. George thought was "reasonable" "[i]n the setting of a negative EMG[,]" but Dr. George wanted to see a "second opinion . . . from a neurosurgeon" because he thought such opinion "would be different[]" and he "want[ed] to make sure we [were] not missing an opportunity with surgical treatment that would address this patient's symptoms." (Tr. 285, 333). He again referred to the IME report that was not before the ALJ and is not before the Court. (*Id.*).

10

Dr. George saw the plaintiff next on September 7, 2016. (Tr. 270-72, 291-93, 334-36).  He noted that the plaintiff "saw an independent medical physician for a second opinion. This was Dr. [Mark] Palumbo at University Orthopedics in Providence, Rhode Island." (Tr. 270, 334, 291). There is no report from Dr. Palumbo in the record.

Upon examination, Dr. George found that the plaintiff had weakness diffusely in the right upper extremity, especially grip strength and finger abduction consistent with lower cervical nerve roots, and he had some weakness in his right triceps, less in his biceps.  (Tr. 271, 292, 335).  He assessed the plaintiff with severe multilevel cervical spondylosis; severe bilateral C5-6 foraminal stenosis; severe right and moderate left C6-7 foraminal stenosis; severe bilateral foraminal stenosis C7-T1; myelomalacia C5-6 and C6-7 without clinical myelopathy; and significant right cervical radiculopathy, especially lower cervical nerve roots. (*Id.*). Dr. George recommended a three-level surgical procedure C5 through to T-1 anterior cervical discectomy and fusion with fixation. (*Id.*). Dr. George noted that he "did review Dr. Palumbo's note and [thought] it [was] generally well thought out. I respect his opinion about considering 4-level fusion, but I would not specifically recommend that within the scope of my practice given the patient's significant smoking history." (*Id.*).  He noted that the plaintiff

> would really like to try to get back to work as soon as possible so he doesn't lose his job and his career.  He has been there for 23 years.  With this in mind, the patient will try a one month course of traction including home cervical traction. He has been out of work completely for the past [four] or [five] weeks and ha[d] noticed possibly some mild improvement of his neurological function, and because of this, he would like to try the traction.

(*Id.*).  Dr. George prescribed Percocet for pain and referred the plaintiff for physical therapy including traction. (*Id.*).[3]  Thus, as of September 2016, not only had Dr. Palumbo advised the plaintiff to consider a four level fusion, Dr. George recommended surgical intervention repeatedly.

On September 19, 2016, Dr. George completed the first of three medical statements for Cigna, the plaintiff's disability carrier.  (Tr. 281).  Dr. George identified the plaintiff's diagnoses as "severe multilevel cervical spondylosis, severe bilateral C5-6 foraminal stenosis; myelomalacia C5-6 and C6-7 without clinical myelopathy.  Right cervical radiculopathy, especially lower cervical nerve roots." (*Id.*).  He noted that the other factors impacting the plaintiff's ability to work were "severe pain. Numbness/weakness in hands. Currently taking Dilaudid [and] Percocet for pain control."  (*Id.*).  Dr. George added "temporary total disability; unable to work in any capacity currently" and "unable to perform any type of prolong[ed] or repetitive activity." (*Id.*).[4]

In the second statement, dated September 30, 2016, Dr. George opined that the plaintiff could frequently stand and walk; occasionally reach at the desk and waist level; frequently perform fine manipulation and simple and firm grasping on the left side, but was unable to reach overhead or perform fine manipulation on the right side or do simple or firm grasping.  (Tr. 289).  Additionally, he opined that the plaintiff could occasionally lift ten pounds with his left arm only, and occasionally carry up to twenty pounds with his left arm; he could push and pull up to five pounds with his left arm; he could occasionally balance, frequently use lower extremities for foot controls, and could not kneel, crouch, or crawl. (Tr. 290).

---

[3] The initial physical therapy evaluation was done on September 14, 2016. (Tr. 229-31, 248-52, 259-64). On initial examination, the plaintiff's range of motion of the cervical spine (flexion, extension, lateral flexion and lateral rotation) were all at 50% bilaterally with strength at four (out of five) for each bilaterally. (Tr. 230, 249, 260). By November 3, 2016, ranges of motion had increased to 75% and the strength levels remained unchanged. (Tr. 244).

[4] Dr. George's opinions as to the plaintiff's disability and work capacity were stated in relation to his workers' compensation and disability insurance claim.

The plaintiff returned to Dr. George, with his "case manager" on October 11, 2016. (Tr. 273-74, 337-39).  He continued "to have dysfunction in the right hand and upper extremity and severe neck pain. He remain[ed] out of work. [He had] great difficulty sleeping at night because of pain." (Tr. 273,337). Dr. George prescribed Dilaudid and Percocet (*id.*) and assessed the plaintiff with right cervical radiculopathy; severe multilevel cervical spondylosis; severe bilateral C5-6 foraminal stenosis; severe right and moderate left C6-7 foraminal stenosis; severe bilateral C7-T1 foraminal stenosis; and "[m]yelomalacia C5-6 and C6-7 without clinical myelopathy." (Tr. 274, 338).

Dr. George noted that the plaintiff "had [two] EMGs . . . . One very abnormal EMG in January and a normal EMG in May."  (*Id*). It was "hard for [Dr. George] to believe that [the plaintiff's] EMG [was] normal on the right side." (*Id.*).  He recommended a neurological consultation and a repeat EMG, and he prescribed OxyContin 20 mg mostly for nighttime use. (*Id.*).

The plaintiff and his nurse case manager returned to Dr. George on November 18, 2016. (Tr. 340-41).  He noted that the plaintiff had a "repeat EMG with Dr. Alessi" on November 15, 2016.  (Tr. 340).  That EMG is not in the record.  Dr. George expressed "confus[ion] . . .as to why [the plaintiff] had an abnormal EMG and now it has seemed to have returned to normal, but he still has significant neurologic deficit."  (Tr. 341).  He recommended that the plaintiff see another neurosurgeon for a second opinion.  (*Id.*).  The plaintiff's carrier, however, did not approve another neurosurgical consultation.  (Tr. 342).

On February 7, 2017, Dr. George gave the plaintiff a note to return to dealing just Baccarat. (Tr. 298, 343).  A month later, Dr. George noted that the plaintiff had "not been able to return to work and at [that] point [did not] feel he [was] going to be able to[]" even knowing that he would

be terminated in May if he did not return to work.  (Tr. 345). Dr. George noted on examination that the plaintiff had "restricted range of [his] motion cervical spine[,] [e]nd range pain . . .[, and] [p]ositive Spurling's on the right. He continue[d] to have some degree of numbness and weakness in the right upper extremity. [That was] unchanged." (Tr. 346). Dr. George stated that the plaintiff was "unable to work at his usual job in [his] judgment because of impairment of the right upper extremity neurologically." (*Id.*).  For his workers' compensation claim, Dr. George added that he:

> would consider him as having reached maximum medical improvement as long as we have decided that there are no further treatments that the patient will undergo. We did talk about a multilevel fusion, and I offered him referral back to one of the physicians he saw for a second opinion previously. Given his smoking history and current smoking, it is unlikely that he would be able to easily heal a multilevel cervical fusion.

(Tr. 346).

The plaintiff and his nurse case manager returned to Dr. George on March 7, 2017.  (Tr. 300-01, 304-05).  He had "[r]estricted range of motion" of his cervical spine, with "[e]nd range pain[,]" and he had "some degree of numbness and weakness in the right upper extremity."  (Tr. 301, 304). Dr. George started the plaintiff on amitriptyline, and the plaintiff was taking OxyContin at night.  (*Id.*). He discussed performing a multilevel fusion but noted that, "[g]iven his smoking history and current smoking, it [was] unlikely that he would be able to easily heal a multilevel cervical fusion."  (*Id.*).

On March 23, 2017, Dr. George completed his third assessment of the plaintiff, in which he opined that the plaintiff could not perform any activity listed in the form.  (Tr. 302-03).

The plaintiff was seen by Dr. George again on April 11, 2017. (Tr. 348-359). "He continue[d] to have neck pain and some weakness in the right upper extremity. [It had] plateaued at [that] point."  (Tr. 348). Dr. George reiterated that the plaintiff "would need to stop smoking before multilevel fusion in [his] judgment[, and] . . . in the absence of any further evaluation or

treatment, the patient ha[d] reached maximum medical improvement in regards to his injury and ha[d] a permanent partial impairment of the cervical spine." (Tr. 349).

As of his May 11, 2017 appointment with Dr. George, the plaintiff continued "to have chronic neck and radiating right arm pain. He ha[d] some paresthesias into the left arm at times. He ha[d] been taking amitriptyline 75 mg at nighttime without great relief. . . . He [had] some symptoms in the left ulnar nerve distribution of his hand. He continue[d] to smoke." (Tr. 350). Upon examination, Dr. George found "[e]quivocal Tinel's sign at the ulnar nerve of the left elbow[,]" and "weakness in both upper extremities worse on the right[.]" (Tr. 351). Dr. George noted that "he really has tried fairly extensive treatments." (*Id.*).  He increased the prescription for amitriptyline to 100 mg at night. (*Id.*)

A month later, the plaintiff had "chronic dysfunction of the right hand and upper extremity[,] . . . some mild weakness in his left hand including grip strength, finger adduction, possible some interossei wasting[,]" and "some recent erectile dysfunction . . . [that] could be related to his cervical spinal cord compression."  (Tr. 352-53).

The ALJ noted this treatment record in his decision, including that Dr. George had assessed the plaintiff with cervical discogenic pain; multilevel cervical spondylosis, especially C5-6 and C6-7 with myelomalacia and spinal cord compression; multilevel cervical foraminal stenosis; and, bilateral cervical radiculopathy, right greater than left. (Tr. 22; *see* Tr. 353-53).  Additionally, the ALJ noted Dr. George's records from September 5, 2017.  (*Id.*).  As of that date, Dr. George had found "[r]estricted range of motion of the cervical spine. Positive Spurling's bilaterally. He continue[d] to have weakness in both upper extremities and this [was] somewhat worse on the right. There [were] some findings consistent with myelopathy."  (Tr. 355).  At that time, Dr. George had assigned a permanent partial disability rating for purposes of the Connecticut Workers'

Compensation Act, finding that "in the absence of any further evaluation or treatment . . . the patient has a 22% impairment of the cervical spine. We agreed that I would see the patient back as needed at this point." (*Id.*).

The ALJ, however, did not reference any of Dr. George's three assessments in his decision. A determination regarding disability under workers' compensation "'is not binding on the Commissioner because other agencies may apply different rules and standards . . . for determining whether an individual is disabled[.]'  However, because these decisions 'may provide insight into the individual's mental and physical impairment(s)[,]' 'evidence  of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.'" *Powell v. Colvin*, No. 3:14 CV 1176 (JGM), 2016 WL 8542604, at *14 (D. Conn. Sept. 28, 2016) (quoting Social Security Ruling ["SSR"] 06-03p, 2006 WL 2329939, at *7 (S.S.A. Aug. 9, 2006)). *See also* 20 C.F.R. § 404.1504 ("[I]n claims filed . . . on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other . . . decision"); *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order).

In this case, the ALJ did not consider all of the supporting evidence underlying Dr. George's assessments.  Dr. George repeatedly referenced limitations in the plaintiff's upper extremities, weakness and numbness, and limitations in his ability to reach overhead.  As discussed above, the vocational expert testified that an individual limited to occasional fine and gross manipulation, and limited in his ability to reach overhead, would not be able to perform the plaintiff's past work.  While the ALJ may reject limitations identified in the record, the ALJ must

articulate his specific reasons for doing so.  Here, the ALJ did not discuss the weight he assigned

to Dr. George's assessments, nor did he even reference them in his decision.

In his decision, the ALJ considered Dr. George's September 7, 2016 treatment record, the

physical therapy records that followed from September to November 2016, Dr. George's review

of the claimant's two EMGs, Dr. George's February 7, 2017 record and his discussion of the

plaintiff's then-recent MRI results, and Dr. George's June and September 2017 treatment records.

(Tr. 19-20). The ALJ discussed the weight assigned to the opinion of Dr. Saris, and to the opinions

of the consultative examiner (Dr. Herbert Reiher), the State agency consultants (Dr. Robert

Weisberg and Dr. Dorothy Leong), and Dr. Andrea Carabello.  (Tr. 22).[5]  He did not discuss the

weight assigned to Dr. George's assessments, nor did he discuss the factors identified in *Estrella*.

Dr. George was the plaintiff's treating orthopedic surgeon, yet the ALJ did not consider the

---

[5] On February 25, 2017, the plaintiff underwent a consultative examination with Dr. Reiher in connection with his SSDI application for benefits.  (Tr. 276-78). On examination, he found that "the patient could do heel-to-toe walking. He could walk on heels and toes and squat. Lumbar spine flexion [was sixty] degrees. Cervical spine flexion [was thirty] degrees, extension [was thirty] degrees, right rotation [was thirty] degrees, left rotation [was forty] degrees. Shoulder elevation[was] 120 degrees bilaterally." (Tr. 277). Dr. Reiher stated that the plaintiff "did give, in my opinion his best effort during today's examination." (Tr. 278). Dr. Reiher assessed no limitation on sitting, standing, and walking, and no postural limitations, and he opined that the plaintiff "could be expected to lift [ten] pounds for one-third of a workday." (Id.). He "ha[d] manipulative limitations of neck[ and] shoulder and hand pain with repetitive reaching, handling, grasping, fingering and feeling." (Id.). The ALJ assigned "partial weight" to Dr. Reiher's opinion. (Tr. 22).

Two days later, in connection with the plaintiff's long-term disability claim, Andrea Carabello, M.D., M.P.H., assessed the plaintiff after reviewing Dr. George's treatment records. (Tr. 307-07).  Dr. Carabello determined that the records evidence "[r]ight cervical radiculopathy" and "[c]ervical spondylosis." (Tr. 306). Dr. Carabello disagreed with Dr. George's assessment that the plaintiff was unable to work.  (Tr. 207). The ALJ assigned "significant weight" to Dr. Carabello's findings.  (Tr. 22).

On March 21, 2017, State agency reviewer, Dr. Robert Weisberg, completed a Physical Residual Capacity Assessment in which he assessed the plaintiff as capable of occasionally lifting, carrying and pulling up to twenty pounds; frequently lifting, carrying and pulling up to ten pounds; and, standing, walking and sitting up to six hours in an eight-hour workday. (Tr. 71). Dr. Weisberg concluded that the plaintiff was limited in both his upper and lower extremities, and in his ability to reach overhead, perform fine and gross manipulation, and feel with both hands. (Tr. 72). Similarly, on July 13, 2017, State agency reviewer, Dr. Dorothy Leong reached the same conclusions. (Tr. 80-84). The ALJ assigned "great weight" to these State agency opinions, although he concluded in his RFC that the plaintiff was capable of occasional reaching overhead, and of frequent gross and fine manipulation, which was required by his past work. (Tr. 22).

Dr. Saris' opinion and the ALJ's treatment of that opinion is discussed below.

frequency, length, nature and extent of Dr. George's treatment history with the plaintiff, his specialization, and the fact Dr. George expressed concern and confusion over "normal" testing results from May 2016, which contrasted with "abnormal" findings from January 2016 and with Dr. George's assessment upon his physical examination of the plaintiff. *See Estrella*, 925 F.3d at 95-96 (citation omitted).

Moreover, the omission of the records referenced by Dr. George had considerable significance. Though the defendant argues that the absence of these records was harmless because they failed to show how the outcome would have been different (Def.'s Mem. at 12), the absence of these records was of particular importance in light of the purported inconsistency with the previous EMG and Dr. George's own assessment as an orthopedic surgeon, and the more recent EMG and the IME opinion, neither of which are in the record.  (*See* Tr. 270, 283, 291, 330, 334, 340 (referring to second EMG and 2016 IME)).  As discussed above, Dr. George emphasized that "[c]ertainly[,] an EMG would . . . [be] helpful in localizing exactly the levels of nerve compression, but it seems to have come back as normal." (Tr. 331). He wanted to see a "second opinion . . . from a neurosurgeon" because he thought such opinion "would be different[]" than the opinion rendered from the IME that is not in the record; Dr. George "want[ed] to make sure we [were] not missing an opportunity with surgical treatment that would address this patient's symptoms."  (Tr. 285, 333; *see also* Tr. 341 (recommending again that the plaintiff see another neurosurgeon for a second opinion).   In light of the stark differences in the January and May 2016 EMGs, he also recommended a repeat EMG. (Tr. 274, 338). Considering the plaintiff's symptoms and limitations, Dr. George found it "hard to believe that [the plaintiff's] EMG [was] normal on the right side." (Tr. 274, 338; *see also* Tr. 341 (Dr. George expressed "confus[ion] . . .as to why [the plaintiff] had

an abnormal EMG and now it has seemed to have returned to normal, but he still has significant neurologic deficit.")).

The Court is mindful of the Second Circuit's admonition that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); *see also Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly") (citations omitted)).

Rather than resolve this inconsistency and gap in the record, the ALJ relied on, and assigned "great weight" to, the opinion of Dr. Stephen Saris, who conducted an IME on the plaintiff in connection with his long-term disability claim.[6] (Tr. 21). Dr. Saris's opinion is not consistent with other assessments in the record. Contrary to the limitations noted by the plaintiff's long-time treating orthopedic surgeon, Dr. George, Dr. Saris opined that the plaintiff had no weakness in his extremities, that there was no evidence of radiculopathy or myopathy, and that there was no evidence of abnormality. (Tr. 21; *see* Tr. 356-62). Dr. Saris claimed that the plaintiff's medical records were "uniformly normal[,]" and that "[t]here [was] . . . no medical explanation for his condition[.]" (Tr. 361). Dr. Saris opined that the cervical MRI study from January 2016 was "normal[ ]" (*see* Tr. 360-61), yet, the medical record shows that, following this

---

[6] Just like Dr. George, Dr. Saris offered his medical opinion in connection with a claim made under another benefits program – Dr. George, in connection with the plaintiff's workers' compensation claim, and Dr. Saris, in connection with the plaintiff's long-term disability claim. Though the ALJ assigned "great weight" to Dr. Saris's opinion, he failed to discuss any of Dr. George's assessments.

"normal" MRI (*see* Tr. 31-33), the plaintiff's then-treating physician, Dr. Chokshi, referred him to

Dr. George for spine surgery.  (Tr. 323). When Dr. George reviewed that same MRI just days

before the plaintiff's onset date of disability, he assessed the plaintiff with "[b]ilateral C7 and C8

radiculopathies; multilevel cervical spondylosis; [s]evere bilateral foraminal narrowing, especially

C6-7 and C7-T1, but also present at C5-6; [c]ervical spinal cord changes at the C5-6 level;

[c]ervical spondylosis C4-5 with less foraminal narrowing; [and] neck injury[,]" and he concluded

that, "because of the numbness and weakness in his hands[, the plaintiff] was a candidate for

surgical treatment sooner rather than later."  (Tr. 328).[7]  In light of these inconsistencies in the

record, the ALJ's decision cannot be based on substantial evidence.[8]

The facts of this case are unusual. "In some circumstances, the duty to develop the record

may include a duty to order that the claimant undergo additional examinations or diagnostic

testing, if doing so is necessary for the ALJ to 'resolve a conflict or ambiguity in the record.'"

*Alford v. Saul*, 417 F. Supp. 3d 125, 141 (D. Conn. 2019) (quoting *Phelps v. Colvin*, 20 F. Supp.

3d 392, 401 (W.D.N.Y. 2014)).  An ALJ's "[f]ailure to obtain an examination necessary to an

informed decision is error." *Id.* at 141 (citing *Falcon v. Apfel*, 88 F. Supp. 2d 87, 90-91 (W.D.N.Y.

2000)).  In this case, the plaintiff's treating provider stated repeatedly that a second opinion was

necessary in light of the inconsistency between two diagnostic tests.  He even recommended a

repeat EMG. Under the circumstances of this case, not only was it essential for the ALJ to consider

---

[7] Additionally, while the ALJ rested his conclusion regarding the plaintiff's RFC on Dr. George's reference to the EMG as "normal[,]" the ALJ cannot translate that interpretation of the report into an assessment of the plaintiff's functional capacity to sit, stand, sit, walk and lift.  *See Brauer v. Comm'r of Soc. Sec.*, No. 17-CV-1288-FPG, 2019 WL 3074060, at *5 (W.D.N.Y. July 15, 2019). Rather, a medical source's opinion is necessary to interpret such results. *Id.*

[8] Additionally, in light of the inconsistencies in the record, and the absence of additional medical evidence, the ALJ's findings as to the credibility of plaintiff's complaints of pain are based on an incomplete record. *See Rivera-Cruz v. Berryhill*, No. 16-cv-2060 (RNC), 2018 WL 4693953, at *8 (D. Conn. Sept. 30, 2018) ("[B]ecause the ALJ failed to properly apply the treating physician rule, 'the credibility evaluation is necessarily flawed.'") (quoting *Mortise v. Astrue*, 713 F. Supp. 2d 111, 124 (N.D.N.Y. 2010)).

Dr. George's records and opinions under the treating physician rule, additional diagnostic testing, and the solicitation of another opinion, was necessary for the ALJ to make an informed decision. *Alford*, 417 F. Supp. 3d at 143-44 (citing *Parker v. Callahan*, 31 F. Supp. 2d 74, 78 n.10 (D. Conn. 1998) ("Courts have required ALJs to order x-rays to ensure development of a full and fair administrative record, but only when x-rays are entirely absent or have not been taken for a long period of time."), *id*. (collecting cases where courts have faulted the Commissioner for failing to order diagnostic testing).

Accordingly, this case is remanded for further consideration and development of the medical evidence and weighing of the opinions of the plaintiff's treating orthopedic surgeon, consistent with the treating physician rule. Although an ALJ's "ultimate conclusions might not change following an adequate development of the record[,]" a plaintiff is "always entitled to a decision based on a fully developed record." *Alford*, 417 F. Supp. 3d at 141 (citations omitted).

B.     OTHER ARGUMENTS

Although the plaintiff's brief identifies additional challenges to the ALJ's decision, the Court need not address them given that the "case must return to the agency either way for the reasons already given, [so] the Commissioner will have the opportunity on remand to obviate th[ese] dispute[s] altogether by" addressing the remaining arguments on remand. *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 94 (2d Cir. 2019).

VI.     CONCLUSION

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is GRANTED such that this case is remanded for additional proceedings consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 18) is DENIED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 26th day of May, 2020 at New Haven, Connecticut.

_/s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge